IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 16, 2020

**STATE OF TENNESSEE v. ROBERT CHARLES ATKINS**

**Appeal from the Criminal Court for Monroe County**
**No. 17-023   Andrew Mark Freiberg, Judge**

_____

**No. E2020-00351-CCA-R3-CD**
_____

A Monroe County Criminal Court Jury convicted the Appellant, Robert Charles Atkins, of first degree premeditated murder, and the trial court sentenced the Appellant to life imprisonment in the Tennessee Department of Correction. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction, contending that the State failed to establish that he was the perpetrator of the crime or, in the alternative, that he acted with premeditation. The Appellant also contends that the trial court erred by allowing a State's witness to testify regarding threats he received prior to trial to explain his nervous demeanor in court. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Chessia A. Cox, Athens, Tennessee, for the Appellant, Robert Charles Atkins.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Stephen Davis Crump, District Attorney General; and Shari Lynn Tayloe, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

A Monroe County Grand Jury returned an indictment charging the Appellant with the first degree premeditated murder of the victim, his father, Charles Taylor. At trial, the victim's girlfriend, Rhonda Lynn Gibson, testified that she and the victim had lived together for three years. They initially lived in Madisonville before moving to a house on Elliott Street in Athens in 2015. Gibson said that the victim had various health issues,

including Parkinson's disease and a "porta-cath." He also had seizures and wore a magnetic bracelet on his wrist to activate a "little machine" that would "zap him" to stop a seizure when it occurred.

Gibson said that she and the victim did not spend a lot of time with his family but that they sometimes "socialize[d]" with the Appellant. However, the victim never went anywhere with the Appellant without Gibson.

Gibson said that on the afternoon of December 19, 2016, she and the victim went grocery shopping, picked up his medication, and returned home for supper. Afterward, the victim watched television in the bedroom, and Gibson watched television in the living room. Sometime between 9:00 and 10:00 p.m., Gibson heard a knock on the door. When she answered the door, she saw a man standing outside on the porch. The man was tall and "skinny," and he was wearing blue jeans and a black hoodie with the hood over the man's head and pulled down so that Gibson could not see his face. The man told Gibson "that Robert had sent him over here to get [the victim], that he, Nathan[,] was having a problem with his car and . . . could [the victim] help him."

Gibson said that she shut the door, leaving the man standing on the back porch. She got the victim, and he went outside and talked with the man for a few minutes. Afterward, the victim came inside, put on his shoes and coat, and walked outside to join the man. The victim was wearing blue jeans, "Tennessee orange" tennis shoes, a long-sleeved t-shirt, and a khaki green jacket with a fur-lined hood. The victim did not take his cell phone, keys, or wallet. Gibson went outside and sat on the back porch and watched as the victim and the man walked down the driveway toward a vehicle that was parked on the road in front of the house. Gibson saw that the vehicle's hood was raised. The men shut the hood, got in the vehicle, and left. Gibson could not see how many people were in the vehicle because part of her view was blocked by a large hedge.

Gibson said a couple of hours elapsed, but the victim failed to return home. Gibson made calls to try to locate the victim; however, she was unable to call the Appellant because she did not have his phone number. Around 8:00 p.m. the next night, Gibson reported the victim's disappearance to law enforcement.

Gibson said that she was shown photograph lineups by law enforcement; however, she was unable to identify the man who came to her house wearing the black hoodie. Gibson stated that she did not know Jacob Smith and did not know what he looked like.

Gibson recalled that on one occasion prior to the victim's disappearance, the Appellant and his girlfriend stayed with the victim and Gibson. The victim called the girlfriend's mother and notified her of the girlfriend's whereabouts. Because the Appellant and his girlfriend did not want her mother to know where she was, the Appellant got angry

and began arguing with the victim. The Appellant threw a granola bar, which hit the victim in the chest. The machine in the victim's chest had to be replaced because the granola bar "broke the leads on it."

On cross-examination, Gibson said that the man got into the driver's seat of the vehicle and the victim got into the front passenger's seat. Gibson did not know of any enemies the victim had, and she noted that the victim never mentioned a "Nathan." Gibson did not think the Appellant was the man in the black hoodie, noting that she would have recognized his voice. Gibson explained that she did not see the man's face but that she would have recognized the Appellant's voice.

On redirect examination, Gibson said that the victim would not have left with someone he did not know. She noted that the lighting where the vehicle was located was poor.

Ricky Jenkins testified that he had property on Griffith Branch Road in the Ballplay area of Madisonville and that a burned mobile home was located on the property. He also had "an old ton truck" there. On December 26, 2016, Jenkins and his girlfriend, Becky Knight, went to the property to check on the truck. Jenkins noted that the road was "difficult" and that people sometimes threw out garbage on the road.

Jenkins said that halfway up the driveway to his property, he saw something he thought was a "dummy" or an "old big doll" that someone had thrown away. Jenkins parked, got out of his truck, touched the dummy on the leg, and realized it was a body. Jenkins noticed that animals had eaten on exposed parts of the body. He was unable to determine whether the body was a man or a woman. Knight photographed the body but did not touch it. Jenkins went to a neighbor's house located straight across from his driveway and asked the neighbor to call law enforcement. Monroe County Sheriff's Deputy Mike Blankenship was the first law enforcement officer to arrive.

Mike Blankenship testified that he worked full time as a paramedic with the Monroe County Ambulance Service and that he worked part time as a patrol officer with the Monroe County Sheriff's Department. Around 4:00 or 4:30 p.m. on December 26, 2016, while working for the Monroe County Sheriff's Department, he was dispatched to Griffith Branch Road. When he arrived, he spoke with Jenkins and Knight, who were waiting in a truck at the edge of the driveway. Thereafter, Deputy Blankenship walked up the driveway.

Deputy Blankenship said that his body camera was recording as he walked up the driveway. The State played a redacted recording from Deputy Blankenship's body camera for the jury. Deputy Blankenship saw the body on the side of the road, but he did not attempt to render medical aid because he noticed the animal's activity on the body and determined that the person had been dead for a "long time." Deputy Blankenship said that

he did not disturb the body or the area around the body. Deputy Blankenship walked to the bottom of the driveway and spoke with Jenkins and Knight. Deputy Blankenship said that other officers arrived and photographed the body and the scene.

On cross-examination, Deputy Blankenship said that the driveway had a "medium sized" incline. He could not recall the weather on the day the body was found, but he thought he had seen puddles and wet ground. Deputy Blankenship said the body was found beside a narrow, one-lane road.

Jacob Smith testified that he did not want to be in court because he was "scared and nervous" due to rumors about a "price on [his] head" and people watching him. Smith explained that approximately one month prior to trial, a man he did not know came to his house. The man was "about 215 pound[s], average build, 5'8", white, in late 20's, early 30's, scruffy, beard wise." The man walked to Smith's house and told Smith "[t]hat there's a price on my head for me not to testify here today, and that I needed to watch who I hang out with, and need to watch my back and don't trust anyone, any, or anything that anyone gives me, a drink or food." After they spoke for three or four minutes, the man asked Smith for a cigarette and walked away. Smith stated that his interaction with the man was "[p]artially" why he was nervous about testifying. He agreed that he also was nervous about "actually being here and testifying."

Smith said that he and the Appellant were in high school together. Smith was a senior, and the Appellant was a freshman, but Smith did not know the Appellant. After the Appellant graduated from high school, he and the Appellant became "reacquainted." Smith was twenty-five years old at the time of trial.

Smith said that in 2016, he worked at Carlex, a glass manufacturing company, for a couple of months, starting at the end of October or the beginning of November 2016. The Appellant worked the same shift at Carlex, but they worked on different "lines." Smith stated that Carlex provided the workers with insulated gloves, paint pens, safety glasses, and "finger cots," which he described as items that "look[] like a condom that you put over your fingers to keep from getting prints or anything on the glass." Smith explained that Carlex employees often kept finger cots in their pockets.

Smith said that he lived with his parents near Tellico when he and the Appellant worked at Carlex, and the Appellant lived three or four minutes from Carlex. Often after working a twelve-hour night shift, Smith was too tired to drive home, and he slept on the couch in the Appellant's apartment. Smith said that the Appellant did not have a vehicle and that usually Smith drove the Appellant to work. Sometimes, their friend Wesley Hutchinson drove them to work.

- 4 -

Smith said that around December 2016, he looked "[r]ough," had facial hair, and weighed 265 to 270 pounds. On the night of December 18, 2016, Smith and the Appellant worked at Carlex. After leaving work, Smith, Hutchinson, and the Appellant went to the Appellant's apartment. Smith fell asleep on the couch and woke around 5:00 or 6:00 p.m. Around 8:00 or 8:30 p.m., the Appellant asked Smith to take him to Athens to pick up his father. The Appellant explained that his grandmother had cancer but could not afford chemotherapy and that she wanted to spend time with her children. The Appellant offered to buy gas for Smith's vehicle and to give Smith methamphetamine and marijuana. Smith agreed to pick up the Appellant's father.

Smith said that he drove a "Mercury Sable . . . '90's model," that sometimes the vehicle overheated, and that occasionally, when driving around 55 or 60 miles per hour, the transmission "would gear down" and "jar you." Smith asserted that he never allowed anyone else to drive his vehicle. Smith said that trash was piled up inside the vehicle and that he had clothes in the vehicle because he never knew where he was going to stay. Smith thought the Appellant may have had clothes in the vehicle because they sometimes took their clothes to the laundromat.

Smith said that before they left Madisonville, he and the Appellant stopped at a Murphy gas station, and he used a gift card to buy $18 to $20 worth of gas. When Smith got back in the vehicle, he threw the receipt on the floorboard of the vehicle or put it in the door. Smith said that he did not know the Appellant's father and had never been to the Appellant's father's house, so the Appellant had to give him directions.

Smith said that they stopped at a house but that he could not describe the house because it was dark. Because the driveway had "ruts and mudholes," Smith parked forty or fifty feet from the house "in a little grassy pull off area at the end of the driveway" where the lighting was "[v]ery poor." Smith was unable to recall specifically what the Appellant was wearing because the incident happened three years prior to trial, but he thought the Appellant was wearing a hoodie, pants, and tennis shoes. Smith did not think the Appellant had the hood pulled over his head, but he was wearing "like a bucket hat, like a fisherman's hat."

Smith said that he watched as the Appellant walked to the porch and knocked on the front door. Smith saw someone answer the door. After the person shut the door, a man came outside. Smith said that he had never seen either person before that night. The Appellant and the man walked to Smith's vehicle. The man identified himself as Charles Taylor, and Smith assumed he was the Appellant's father. Smith recalled that the victim was wearing "one of those bubble jackets that's kind of poofy, insulated jackets, a beanie, some blue jeans and some tennis shoes." The jacket had a fur-lined hood. The Appellant asked Smith to "pop [the car's] hood" so he could investigate the problem with the transmission. Smith complied. The victim looked under the hood, checked the spark plugs,

and told Smith that the vehicle's thermostat might be stuck, which could cause the vehicle to overheat. The men closed the vehicle's hood, and Smith got into the driver's seat, the Appellant got into in the front passenger's seat, and the victim got into the backseat.

Smith said that they drove to Madisonville but that they did not go to the Appellant's grandmother's house when they arrived because it was late. Instead, they decided that the Appellant and the victim would "[h]ang out [and] catch up" while Smith drove them around and got "high" and that Smith would take them to the Appellant's grandmother's house the next morning. Smith drove on old logging trails and "little pull offs on Ballplay Road" that he had been on when he was a teenager and drove a "four-wheeler." The victim did not use any drugs because he did not want to fail a drug test at his doctor's appointment in a couple of days.

Smith said that they stopped at a location on Griffith Branch Road. They did not go very far up the hill because the "ruts got really bad," and Smith's vehicle "bottomed out a time or two." Smith saw a trailer to the right of the driveway but did not think anyone was living in it. The only available light was moonlight, so the area was not well-lit. They "hung out for a little while," and Smith "got high" smoking methamphetamine. The Appellant got out of the vehicle and went to relieve himself. When he returned to the vehicle, he smoked marijuana with Smith.

Smith said that the Appellant got out of the vehicle again and asked the victim to get out and talk with him. The victim complied, and Smith saw the Appellant and the victim with "their arms around each other." Smith said they were not hugging, but their arms were "over their shoulders." The Appellant and the victim walked twenty or thirty feet up the hill in front of the vehicle and started to fight. The Appellant got the victim "in a headlock and started hitting him." The victim "[a]ttempt[ed] to fight back," and the Appellant reached for his pocket. Smith then closed his eyes. He explained that he did not like to watch fights and was not a violent person.

Smith said that a minute and a half to two minutes later, the Appellant opened the vehicle's front passenger's side door. Smith opened his eyes and saw the Appellant removing his clothes outside the vehicle. The Appellant, who had blood on his face, told Smith "[t]hat he must have got [the victim's] jugular or something because of blood spray or that he got some, some of his, [the victim's] blood in his mouth." Smith was scared and asked where the victim was. The Appellant replied that the victim was lying on the ground. The Appellant removed his clothes "[a]ll the way down to his boxers," poured Powerade on his t-shirt, and wiped the blood off of his face. The Appellant put his dirty clothes in a Walmart bag he found in the trash in Smith's vehicle. The Appellant put on a black hoodie and blue jeans or sweat pants.

- 6 -

Smith said that the Appellant got into the vehicle and told Smith to drive, but Smith did not recall if the Appellant told him where to go. During the drive, the Appellant threw something out of the window and into the ditch or the lake. Smith did not see what the object was "for certain," but he thought it was a magnetic bracelet he had seen on the Appellant's wrist when he got in the vehicle. The Appellant said "[i]t was a magnet for his dad's heart, a pacemaker, I think." Smith did not see the bracelet again. Smith drove the Appellant to Scenic River Road, which "dead end[ed]" in a graveyard. Smith parked in the graveyard for a few minutes while he smoked marijuana.

Smith said that at some point, he asked the Appellant "why or what happened," but he could not recall "if that was at the graveyard." The Appellant said that he would tell Smith about it later. Smith said that the Appellant seemed excited and said "the feeling was better than sex." Smith assumed the Appellant was talking about the "adrenaline rush." The Appellant said "[t]hat his dad was strong and something along the lines of if he'd have fought that hard for, for him when he was a kid then we might not have been in that, the situation might not have happened."

Smith said that after staying at the graveyard for twenty or thirty minutes, they went to "a house over next to Stephens's store." Smith was unfamiliar with the house, and he did not know the homeowner, but he had seen him "a time or two." Smith learned that the homeowner's first name was Ed, but he did not learn his last name. An occupant of the house, Sarah Carroll, asked Smith to drive her to a store so she could buy cigarettes, and Smith agreed. Just before leaving to drive Carroll to the store, Smith saw the Walmart bag containing the Appellant's dirty clothes lying on the floor just inside the door of the house. Smith saw a smoking "burn barrel" at the house, but the Appellant did not mention the barrel. Smith did not see anyone put anything in the barrel, and he did not see the bag of dirty clothes again.

Smith said that when he and Carroll left the house, the Appellant was in Ed's bedroom talking with Ed. A short while after Smith and Carroll returned to the house, Smith left the house. He picked up a friend, Cody Moser, and they smoked marijuana together so Smith could "try to calm down." Afterwards, Smith returned to Ed's residence, and he and the Appellant went to the Appellant's apartment. Smith said that he did not call law enforcement because he was "terrified." He explained, "I mean . . . it's not every day . . . you see a murder. You know, you see it on TV and stuff all the time, but when you're in a real life situation it's a lot different." Smith said he was scared that he could be the Appellant's next victim if the Appellant suspected Smith contacted law enforcement. After they arrived at the apartment, Smith fell asleep on the couch.

Smith said that the next day, he and the Appellant went for a walk outside the apartments. The Appellant asked Smith to remove the battery from Smith's cell phone and leave the phone behind. The Appellant had never made such requests previously. As they

walked, the Appellant told Smith that "his father really wasn't much of a father at all" and had "allowed people to . . . molest" the victim when he was a child. The Appellant "said his grandmother had case files of the whole ordeal," but Smith did not have any proof that the Appellant's allegations were true. Smith did not recall if the Appellant talked about the previous evening. The Appellant did not ask Smith not to tell law enforcement what happened; however, he told Smith "that if anything come of it that he would take full credit."

Smith said that at some point after the victim was killed, he was sitting on the Appellant's couch. The Appellant tossed a knife to him, and said "that was what he used." Smith surmised that the Appellant meant he used the knife to kill the victim. Smith described the knife as "red with flames on it." The knife had a "seat belt cutter" and a button on the bottom for "bust[ing] out windshields." Smith was not certain if he had seen the knife before, noting that the Appellant "had a lot of knives." Smith used a rag to wipe the handle before handing the knife back to the Appellant. Smith stated that the knife "ended up" in a pair of jogging pants in the back of his vehicle. Smith did not know whether the pants belonged to him or the Appellant, noting that he and the Appellant had done laundry a few days before the knife was discovered. Smith denied that he would have kept the knife in his jogging pants.

Smith stated that after the Appellant showed him the knife, the Appellant hid Smith's cell phone and car keys. While his keys were missing, Smith stayed at the Appellant's apartment, and Hutchinson drove them to work. After finding his keys, Smith went to his parents' house. That same day, Agent Herron and other officers came to his parents' house and questioned Smith about the victim's murder. Smith said that his conversation with law enforcement occurred approximately one week after the murder. Smith acknowledged that he did not tell law enforcement the truth, explaining that he was "scared [and] terrified" because the Appellant was "still on the streets." Smith did not recall if he told Agent Herron that he had wiped the knife's handle. Smith said that his vehicle was registered in his father's name and that he and his father gave law enforcement consent to search his vehicle.

Smith acknowledged that he told Agent Herron a different story several weeks later during a second interview. Smith maintained that the second story was the truth. Smith asserted that he did not have anything to do with the killing of the victim.

On cross-examination, Smith stated that when the Appellant went to the victim's house, the Appellant was wearing a hoodie. Smith could not recall the color, "but it wasn't black." Smith said that he, the Appellant, and the victim arrived in Madisonville around 9:30 or 10:00 p.m. and arrived at the location on Griffith Branch Road around midnight. Smith recalled that when the Appellant and the victim got out of the car and walked up the hill, "they had their arms over each other's shoulders . . . [a]nd it looked like it was friendly"

until the Appellant put the victim in a "headlock" and started punching him. The victim attempted to defend himself and fight back. Smith saw the Appellant reach into his pocket. At that point, Smith closed his eyes. Smith explained, "I'm not a violent person. I don't like violence, I don't fight, I don't like watching fights . . . ." Smith acknowledged, however, that an order of protection had been issued against him which had lasted one year. He estimated that the altercation between the Appellant and the victim had lasted approximately one to one and one-half minutes before Smith closed his eyes.

Smith said that he sat in the vehicle for "a few, few seconds, maybe a minute" with his eyes closed. Smith opened his eyes when the Appellant opened the front passenger's side door of the vehicle. Smith could not tell if the Appellant had blood on his clothes but saw that he had blood on his face. The Appellant stripped down to his boxer shorts, poured Powerade on his t-shirt, and used the shirt to wipe the blood off of his face. The Appellant then put his clothes and shoes into a plastic Walmart bag and put the Walmart bag in the front passenger's side floorboard. Smith asked the Appellant where the victim was, and the Appellant responded, "'He's on the ground up there.'" The Appellant told Smith to drive. Smith said that he did not check on the victim because he was scared.

Smith drove to a graveyard approximately six miles away because "[i]t was the closest place that you could sit at for a minute and try to calm down and assess the situation." At the graveyard, the Appellant got some clothes from the trunk of the vehicle and put on a black hoodie, his work boots, and blue jeans or jogging pants. Smith did not know if the clothes belonged to the Appellant or to him. Smith explained that he and the Appellant often did laundry together, that a lot of their clothes were "mixed in together," and that they "had all the laundry in duffle bags and backpacks in the trunk" of Smith's vehicle.

Smith agreed that after leaving the graveyard, they went to the house next to Stephens's store before returning to the Appellant's apartment. When Smith woke the next afternoon, the Appellant and Smith walked around the apartment complex, and the Appellant told Smith "about the sexual abuse from when he was a child and how his father wasn't much of a father."

Smith thought that the Appellant showed him the knife two or three days after the murder. Smith explained that he was unsure about the timing because he "was really bad on methamphetamines at that time, and it would be two or three days where we didn't sleep. . . . I mean, there was times where there was two or three days where we didn't sleep from the drugs." Smith said that when the Appellant tossed the knife to him, "the knife blade was still in the handle." Smith used his t-shirt to wipe off the handle where he had touched it. When asked if he could explain how the knife got in the pants in his vehicle, Smith said, "I mean, [the Appellant] could have been wearing the pants and took them off

and just threw them in there . . . or threw them in one of his duffle bags on laundry day, could have, could have got washed."

Smith said that approximately one week after the murder, he was at his parents' house, and Agent Herron and Monroe County deputies came to see him. Their questioning made Smith nervous, so he told a false story to the agent in charge and asked for a lawyer. Smith agreed that, later, with the assistance of counsel, he gave another statement. Smith stated, "I lied the first time because I was scared, and then when, after receiving counsel and when I met with the agent in charge the second time, [the Appellant] was already incarcerated." Smith thought he told law enforcement that he wiped off the knife, but he acknowledged, "[I]t's been three years ago." Smith agreed that law enforcement mentioned the Murphy gas station receipt and that he assumed they had traced the receipt to him. Smith was afraid that law enforcement believed he was the murderer. Smith said that he would have eventually gone to law enforcement on his own "once I got away from [the Appellant] and felt safe."

Dr. Christopher Lochmuller testified that he was the Chief Deputy Medical Examiner for Knox and Anderson Counties and that he served as a forensic pathology consultant to approximately twenty counties in East Tennessee. Dr. Lochmuller testified without objection as an expert in the field of forensic pathology.

Dr. Lochmuller said that his office received a call about a body that was found in a remote location with apparent stab wounds. On December 27, 2016, Dr. Lochmuller performed an autopsy on the body. During the examination, Dr. Lochmuller discovered a "vascular access port" under the victim's skin on the left side of his abdomen. Dr. Lochmuller also located a "stimulator" under the skin in the left side of the chest which was used to stimulate "the Vegas nerve" of a person who suffered from seizures. Dr. Lochmuller used the serial number on the device to confirm the victim's identity.

Dr. Lochmuller said that the victim was wearing a coat, a t-shirt, a long sleeve thermal shirt, a pair of pants, socks, shoes, and a pair of gloves. The victim's clothing and skin were wet, which led Dr. Lochmuller to surmise that the victim had been exposed to a wet environment for some time. Dr. Lochmuller's evaluation of the victim was limited by the extensive loss of skin and soft tissue of the head, neck, upper chest and back, and the right upper extremity due to animal's activity on the body; therefore, he was unable to determine a cause of death. Nevertheless, after cleaning the body, Dr. Lochmuller determined that the victim had "several sharp force injuries, so there was some kind of sharp object like a knife that cause injury to his body." Specifically, the victim had two stab wounds to the right side of his chest; one stab wound to the left side of his back; a cut across the second, third, and fourth fingers of his right hand; and a cut to the "palm surface of the right forearm." The body also had a bruise on the left upper chest and two bruises on the back of the right forearm.

Dr. Lochmuller said that the upper stab wound to the chest was an inch long and at least two and a quarter inches deep. Dr. Lochmuller explained that the exact depth of the wound could not be determined because the heart and lungs were missing due to the animal's activity on the victim's body. The trajectory of the wound was from the back to the front, from right to left, and upwards. Dr. Lochmuller could not determine the exact amount of force needed to inflict the wound, but he said, "You're gonna have to . . . push pretty hard . . . ." Dr. Lochmuller said that the lower stab wound on the right side of the chest was of similar length, depth, and trajectory as the upper stab wound to the chest. Dr. Lochmuller said that without medical attention, either stab wound alone would likely have been fatal but that the remaining wounds should not have been life-threatening. Dr. Lochmuller found defects in the victim's t-shirt that corresponded with the stab wounds. Dr. Lochmuller determined that the animal's activity to the victim's body occurred after the victim's death.

Dr. Lochmuller sent the victim's blood for toxicology testing, and no alcohol or "drugs of abuse" were found. Dr. Lochmuller determined that the victim "died from multiple sharp force injuries" and that the manner of death was homicide.

On cross-examination, Dr. Lochmuller said that he did not recall being sent a weapon to compare with the victim's wounds. Dr. Lochmuller said that without medical treatment, it would have taken hours for the victim to "ble[e]d out" with the two potentially fatal stab wounds. Dr. Lochmuller said that because of the amount of skin and tissue missing, he could not determine if the victim suffered additional wounds.

On redirect examination, Dr. Lochmuller was shown a photograph of the pocketknife the Appellant told Smith he used to kill the victim. Dr. Lochmuller said that a pocketknife like the Appellant's could have cause the injuries.

Agent Keith Herron with the Tennessee Bureau of Investigation (TBI) testified that on December 26, 2016, he was dispatched to Griffith Branch Road to assist in the investigation into the victim's death. Agent Herron said that he saw the victim lying face down in the ditch and noticed animal's activity on exposed parts of the body. Agent Herron did not find any identification, keys, coins, or cell phone on the victim's body, so he was unable to determine the victim's identity. Deputies photographed the scene before the victim's body was taken away. The police found a receipt from a "Murphy USA" gas station in Madisonville at the scene. Agent Herron said that the receipt seemed out of place, and it was still intact as if it had not been there long.

Agent Herron said that he went to the Murphy gas station and reviewed the security video from the time, date, and pump number that was on the receipt. The receipt reflected that the purchase was made with a gift card. The video was shown to the jury. The video

showed Smith pumping gas, but no one could be seen inside the vehicle. Agent Herron said that Smith was wearing a coat which was a lighter color than his pants and that Smith's size was "very large." Agent Herron said that the video and the receipt corroborated Smith's statement.

Agent Herron said that on December 27, 2016, he went to Smith's parents' house and talked with Smith. Smith gave law enforcement permission to search his vehicle. Smith's mother also consented to a search of the vehicle. The vehicle was initially transported to the Monroe County Sheriff's Department's evidence impound lot and then it was sent to the TBI crime lab in Knoxville for processing.

Agent Herron said that thereafter, Smith came to the Monroe County Sheriff's Office, and he was interviewed by Agent Herron and Detective Williams. Smith said that he and the Appellant picked up the victim, but he did not mention during the first interview that the victim had been killed. At the end of the interview, Smith asked for an attorney. After contacting an attorney, Smith was interviewed by Agent Herron and the prosecutor while his attorney was present. Agent Herron said that Smith's trial testimony was consistent with his statements in the second interview. Smith's description of events in his second statement also was consistent with what the police saw when the body was discovered. Smith told Agent Herron that he always drove his vehicle and that he was never on the passenger's side of the vehicle. Agent Herron said that he saw blood on the inside of the passenger's side window of Smith's vehicle and that blood on the passenger's side helped confirm Smith's statement.

Agent Herron said that after his interview with Smith on December 27, 2016, he interviewed the Appellant later that day at the Monroe County Sheriff's Department. Agent Herron stated that the Appellant was not "very cooperative," that he would "rephrase" each question, and that he said he was "doing his own investigation." The interview lasted two or three hours. In the middle of the interview, the Appellant took a "smoke break," after which one of his cigarette butts was submitted to the TBI crime lab for testing. Agent Herron also submitted the Appellant's buccal swab to the lab.

Agent Herron said that eventually, even without Smith's statement, law enforcement would have spoken to the Appellant because the victim was a missing person, and the Appellant was one of his relatives. Additionally, the Appellant's DNA was found on the pocketknife law enforcement discovered in Smith's vehicle.

Agent Herron said that in an attempt to identify the person who came to the victim's house on the night of his disappearance, he showed Gibson photograph lineups but that Gibson was unable to identify anyone.

On cross-examination, Agent Herron acknowledged that other items, including clothing, were found at the crime scene. Agent Herron thought the items were submitted to the crime lab but did not know if they were tested.

Agent Herron said that during Smith's initial interview on December 27, 2016, Smith was "standoffish" and "evasive." Agent Herron thought law enforcement confronted Smith with the receipt they found at the crime scene. Agent Herron thought Smith did not "want to be there" during the second interview, "but he did answer the questions." Agent Herron said that the Appellant's photograph was included in one of the lineups he showed Gibson. Gibson said that the photograph appeared to be an old photograph of the Appellant.

On redirect examination, Agent Herron said that during his interview, the Appellant mentioned that Smith did not know the victim or how to get to the victim's house.

Detective Chris Williams with the Monroe County Sheriff's Department testified that on December 26, 2016, he was dispatched to Griffith Branch Road because human remains had been found. Detective Williams arrived at the scene around 4:00 or 4:30 p.m., and he saw a few marked vehicles and one unmarked vehicle at the bottom of the driveway. Detective Williams spoke with the patrol officers who were at the scene before proceeding "up the roadbed" to the location where the body was discovered on the left side of the driveway. Detective Williams noticed a few "little small finger protectors" were lying around the body. Detective Williams found items of clothing that appeared to have been pulled off the victim by animals, including a hood to a coat or jacket.

Detective Williams said that he collected evidence from the scene while Detective Shane Harrold photographed the scene. Most of the items collected by the police were found close to the body. However, a cigarette lighter and a Bud Light can were collected from the lower part of the driveway.

Detective Williams said that law enforcement officers knew that a person from Athens was missing and was last wearing clothing that matched the victim's clothing; however, the officers were not certain of the victim's identity because the victim's face was unrecognizable. Detective Williams noted that the distance from the victim's residence in Athens to Griffith Branch Road was 25.7 miles.

Detective Williams said that he and Agent Herron interviewed Gibson and the Appellant. Detective Williams recalled that the Appellant was evasive, wanted to talk about himself instead of his relationship with the victim, and was easily agitated during the interview. When the Appellant became agitated, Detective Williams and Detective Jason Fillyaw took the Appellant outside so he could smoke a cigarette. Afterward, Detective Williams collected the Appellant's cigarette butt for testing.

- 13 -

On cross-examination, Detective Williams said that he wore latex or synthetic gloves when he collected the evidence at the scene. Detective Williams acknowledged that he did not collect any leaves or sticks from the scene but that he would have if they had appeared to be stained with blood.

Marla Newport, a special agent forensic scientist with the forensic biology unit of the TBI's crime lab, testified, without objection, as an expert in the field of forensic biology. Agent Newport said that she obtained Smith's DNA profile from a cup he had used. She obtained the Appellant's DNA profile from the butt of a cigarette the Appellant smoked.

Agent Newport said that on December 28, 2016, she and her team examined Smith's vehicle at the crime lab. Agent Newport did not notice anything of evidentiary value on the outside of the vehicle. She said that "a lot of stuff" was inside the vehicle. In the front driver's side area, the team found handcuffs, finger cots, green plant material that was possibly marijuana, and "a razor box knife." Agent Newport noted that the blade of the knife was not open and that no reddish brown stains were found on it. On the floorboard of the front passenger's side of the vehicle, the team found more finger cots, some of which were dirty, and "a white glove with a reddish brown stain on the outside of the glove." The stain tested presumptively positive for blood. Agent Newport "noticed a reddish brown stain on the inside window of the front passenger door," which tested presumptively positive for blood. She took a sample of the stain on the window for further testing.

Agent Newport said that while cataloguing the items in the backseat area, one of her team members found a pocketknife in the pocket of a pair of sweatpants. The knife was submitted for further testing.

Agent Newport noted that the victim's clothing was submitted to the crime lab. However, given the time that had elapsed since the crime and the number of times the victim had been stabbed, Agent Newport thought that any DNA left by the perpetrator would have been "covered up by" the victim's blood."

Regarding the items collected from the crime scene, Agent Newport said that she found an inconclusive DNA profile on the yellow lighter and found no DNA profile on the beer can. Agent Newport noted that a flashlight, a finger cot found near the body, the inside of a finger cot found downhill from the body, and a finger cot found underneath the body had a DNA mixture of at least two individuals. At least one the individuals was male, but due to the limited profile, no further determinations could be made. The DNA on the outside of the finger cot found downhill from the body was consistent with a mixture of two individuals, at least one of whom was male, and the major contributor matched the victim. The "beanie cap" had a DNA mixture of at least two individuals, at least one of

- 14 -

whom was male. The major contributor matched the victim, and the minor contributor was inconclusive.

Agent Newport said that the swab from the stain on the passenger's side window tested positive for the victim's blood. Agent Newport tested the handcuffs and found a mixture of at least three individuals; however, "due to the unknown number of potential contributors to the profile, interpretation was inconclusive." Agent Newport tested the blood stain on the palm of the white glove and determined that it matched Smith's DNA profile. On the inside of the wrist area of the glove, she found a mixture of at least two individuals, at least one of whom was male, but the profile was limited, and the interpretation was inconclusive. Agent Newport said that she did not perform any tests on the box cutter. She explained that no reddish brown stains were on the box cutter and that the victim's wounds "were consistent with a survivor knife and not a box cutter."

Agent Newport said that the pocketknife was in the closed position when it was discovered and that she opened it for testing. The tip of the blade was negative for blood. However, "the crevice between the screws, these little screw type things and the handle was swabbed, and it tested positive for the presence of blood." The blood was consistent with a mixture of two individuals, at least one of whom was male, and the major contributor matched the victim. The length of the blade was approximately three and a half inches long, and the handle was approximately four and a half inches long. The handle tested positive for blood. The DNA profile was consistent with a mixture of two individuals, at least one of whom was male, and the major contributor was consistent with the Appellant. Agent Newport explained that the pocketknife handle was textured and had "a lot of nooks," so a person would need to rub the handle hard and take time in order to remove DNA from the handle. Agent Newport could not say how long the Appellant's DNA had been on the handle. Agent Newport opined that the Appellant had "contributed more DNA to the knife than a secondary individual."

On cross-examination, Agent Newport agreed that the pocketknife was not a switchblade, that she had to open it with two hands, and that it was impossible to open it with one hand. Agent Newport acknowledged that wearing gloves or finger cots could prevent the transfer of DNA onto an object.

Agent Newport said that the blood stain on the inside of the passenger's side window of Smith's vehicle appeared to be a "smear. It's not a type of spatter where something was hit and it spattered onto the window. It looks like it was smudged onto the inside glass." Agent Newport said that her team initially had difficulty getting the trunk open with the keys but that TBI Agent Thompson "removed the cover from the trunk release lever to find the trunk release cable and he opened the trunk that way." The trunk "was mostly full of more bags of clothing and garments." Agent Newport did not find any blood inside the trunk.

- 15 -

Agent Newport said that a member of her team, Jamie Rash, found the pocketknife in a pocket of a pair of gray sweatpants when she removed the pants from the vehicle. Agent Newport did not know why the sweatpants were not taken into the evidence.

Agent Newport said that blood was not found on the tip of the blade of the pocketknife. She surmised that "the blade could have been wiped off and they just didn't get in the crevices where the blood was found." Agent Newport stated that another possibility was that when "the victim was stabbed, then as it came out, the clothing from the victim could have potentially wiped the blood evidence off."

At the conclusion of the trial, the jury convicted the Appellant of the first degree premeditated murder of the victim. The trial court imposed a sentence of life imprisonment. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction. The Appellant also contends that the trial court erred by allowing Smith to testify regarding threats he received prior to trial.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant contends that the evidence was insufficient to sustain his conviction for first degree murder. Specifically, he contends that the State failed to prove that he killed the victim or, in the alternative, that he acted with premeditation.

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim.

- 16 -

App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

The Appellant contends that the proof suggested that Smith, not the Appellant, killed the victim and that the proof did not establish that the killing occurred as the result of premeditation. In order to obtain the Appellant's conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that the Appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). The identity of the perpetrator is an essential element of a crime, and proof of the perpetrator's identity may be established through circumstantial evidence, direct evidence, or a combination of the two. See State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). The identification of a defendant as the perpetrator is a question of fact for the jury. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005).

Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the Appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the Appellant's declarations of intent to kill; (3) the Appellant's planning activities before the killing; (4) the manner of the killing, including the Appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the Appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

In the light most favorable to the State, the proof at trial revealed that the Appellant asked Smith to drive him to Athens to pick up the victim so that the Appellant and the victim could visit the Appellant's terminally ill grandmother in Madisonville. Smith agreed. The victim had many medical issues, including Parkinson's disease, a "porta-cath," and a machine implanted in his chest that would "zap him [to] . . . bring him back out of a seizure." Smith did not know the victim, and the Appellant had to give him directions to the victim's house. Upon arriving, Smith watched as the Appellant walked to the victim's house, knocked on the door, and saw someone answer the door. Gibson stated that the man who came to her door asking for the victim claimed that he wanted to speak with the victim because of problems with his car. In other words, the proof shows that the

Appellant concocted a story to lure the victim away from his home and to a remote location in Madisonville.

Gibson described the man as tall and "skinny" and wearing a black hoodie and blue jeans. Smith described himself as six feet tall and 265 or 270 pounds, and Agent Herron described Smith as "very large." Smith did not match the description of the man who went to Gibson's house. Gibson saw the victim and the man get into a vehicle and leave. After the Appellant lured the victim out of his house, the three men drove to Madisonville. It was late when they arrived in Madisonville, and the men decided to "hang out" and visit the Appellant's grandmother the next morning. The men eventually went to a remote location on Griffith Branch Road. While there, the Appellant got out of the vehicle and asked the victim to accompany him. The victim complied. As they walked, the Appellant got the victim in a "headlock" and began hitting the victim. Smith saw the Appellant reach into his pocket but then closed his eyes. A minute or two later, Smith opened his eyes when the Appellant returned to the vehicle alone, and his face was covered with blood. The Appellant removed all of his clothes except his underwear, poured Powerade on his t-shirt, wiped the blood from his face, and put his dirty clothes in a plastic Walmart bag. The Appellant told Smith he must have struck the victim in the jugular vein and got the victim's blood in his mouth. The Appellant seemed excited and told Smith that "the feeling was better than sex." The Appellant threw away the victim's magnetic bracelet, which could have helped identify the victim, and disposed of the clothes he wore during the offense.

The next day, the Appellant told Smith that the victim was not "much of a father" and that the victim allowed people to "molest" the Appellant when he was a child. A few days after the crime, the Appellant showed Smith the pocketknife the Appellant "used" to kill the victim. Law enforcement later found the pocketknife concealed in a pair of sweatpants in Smith's vehicle. Testing revealed the presence of the Appellant's and the victim's DNA on the pocketknife. Dr. Lochmuller determined that the victim's death was caused by multiple sharp force injuries, namely two stab wounds to the chest, and he stated that the pocketknife was consistent with the weapon that could have caused the stab wounds. No weapon was found on the victim, indicating the victim was unarmed at the time the Appellant attacked him. The victim's blood was found on the front passenger's side window of Smith's vehicle. Smith testified that he was the driver and that the Appellant rode in the front passenger's seat. We conclude that the evidence is sufficient to sustain the Appellant's conviction of first degree murder.

### B.  Testimony Regarding Threats

Before the State called Smith to testify at trial, the trial court granted the State's request for a jury-out hearing "for the limited purpose of what threats may or may not have been conveyed" to Smith in order to explain Smith's demeanor in court and his reluctance to testify. The Appellant objected, arguing that the threats were not relevant to any issues

at trial, that the threats were hearsay, and that no exception to the rule against hearsay had been established.

Smith testified that he had received a Facebook message from a friend's girlfriend, warning him that he and his family were being watched. Smith refused to identify the friend because the friend was in jail with the Appellant. Additionally, Smith testified that approximately one month prior to trial, a man whom Smith did not know walked to Smith's house from the nearby jail and informed Smith that someone had offered $1,000 to ensure Smith did not testify. Agent Herron testified that Smith told him about the warning from the unidentified man. Agent Herron said he had been unable to confirm that Smith had been threatened by someone in jail but that he heard of "rumors."

At the conclusion of the jury-out hearing, the trial court stated that Smith did not "exhibit a good appearance and demeanor that you would normally equate with truthfulness" and that he seemed reluctant to testify. Accordingly, the trial court found that the threats made against Smith were relevant to explain Smith's appearance and demeanor as they related to his credibility. The trial court found that the Facebook message was "double hearsay" and that it did not have an "indicia of truthfulness or reliability." However, the trial court found "indicia of truthfulness and probativeness" regarding the threats the unidentified man conveyed to Smith.

On appeal, the Appellant contends that the trial court erred by allowing Smith to testify that he was threatened by an unidentified man prior to trial in an attempt to prevent him from testifying. The Appellant maintains that the testimony was hearsay, that it was not relevant to Appellant's case and prejudiced the jury against the Appellant. In response, the State contends that the Appellant waived this issue by failing to raise it in his motion for new trial.

Our review of the Appellant's written motion for new trial reveals that he challenged only the sufficiency of the evidence sustaining his conviction. As this court has repeatedly stated, generally the failure to raise an issue of error, other than sufficiency of the evidence or sentencing, in a motion for a new trial waives that issue for purposes of appellate review. See Tenn. R. App. P. 3(e). Moreover, we are unable to determine whether the Appellant orally amended the motion because the Appellant failed to include a transcript of the motion for new trial hearing in the appellate record. The Appellant carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. Tenn. R. App. P. 24(b); see also Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). Accordingly, we agree with the State that the Appellant has waived this issue.

### III. Conclusion

The judgment of the trial court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE